ODOM, Justice.
 

 Miss Lolita Locarno died in the City of New Orleans on July 7, 1943, leaving a last will and testament in olographic form dated September 11, 1941, by which she disposed of all of her property. She appointed Mr. Paul Villere executor. An inventory of the property of which she died possessed was made in the probate proceedings, and the property was appraised at $74,981.36. According to the recapitulation made by the appraisers, the property consisted of:
 

 Cash $ 5,605.00
 

 Bonds 43,046.22
 

 Stocks 3,588.25
 

 Contents of residence $2,791.00
 

 Contents of bank box in Hibernia National Bank of New Orleans 1,101.00
 

 Real estate 17,000.00
 

 Securities held by Trust Department of Hibernia National Bank 1,184.03
 

 Bank accounts 665.86.
 

 Among other special bequests made in the will appears the following: “I want my two houses (including the lots in the back of each) 1122 and 1120 Saint Philip to be put up for sale, and out of this sale I give and bequeath Evelyn Penn Puig $1000.00 Jack Yuille, $1000.00 St. Augustin Church $1000.00 Mandeville Arnoult $300.00 in memory of his numerous kindnesses to me and mine. — The rest of the money from the two houses I give and bequeath to the Maison Hospitaliere (I mean the rest of the amount brought from small houses).”
 

 As we have said, Miss Locarno died on July 7, 1943. On March 24, 1943, about three and a half months prior to her death, she sold by notarial act the property bearing Municipal No. 1120 St. Philip Street for a cash consideration of $3300. The property sold was a part of the property mentioned in the above-quoted special bequest.
 

 Miss Locarno had a bank box at the Whitney National Bank, and in that box were found two envelopes, one containing $3000 in currency and the other containing $2605 in currency.
 

 On September 13, 1943, the testamentary executor filed a provisional account by which he proposed to sell, under order of
 
 *387
 
 the court, the remaining portions of the two parcels of ground Nos. 1120 and 1122 St. Philip Street (the house described by the Municipal No. 1120 having been sold by Miss. Locarno), and, in the event that the net proceeds of the sale should amount to $3300, he proposed to pay the following cash legacies: to Mrs. Evelyn Penn Puig $1000; to Jack Yuille $1000; to St. Augustin Church $1000, and to Mandeville Arnoult $300. He proposed, in the event the net proceeds should exceed $3300, to deliver whatever balance there was left to the Maison Hospitaliere. In the event that the net proceeds of the sale did not equal $3300, he proposed to deliver said net proceeds ratably to the above-mentioned special legatees. In other words, the executor proposed to carry out the will of the testatrix as nearly as he could by selling the remaining property on St. Philip Street, and, if the proceeds of such sale were sufficient, he would pay Mrs. Puig, Jack Yuille, the St. Augustin Church, and Mandeville Arnoult the amounts bequeathed to them, and, if the proceeds were not sufficient for that purpose, he proposed to deliver the net proceeds to them ratably, and, if the proceeds of the sale exceeded $3300, he proposed to pay the excess to the Maison Hospitaliere, which' was the residuary legatee under this special bequest.
 

 The provisional account of the executor was opposed by Mandeville Arnoult, the St. Augustin Church, and the Maison Hospitaliere, claiming that the $2605 in currency found in one of the envelopes in Miss Locarno’s bank box should be delivered to them, because, as they allege, this currency “is part of the same currency which the decedent received from the sale of said property; that said sum was never commingled with her other funds or deposited by her in her checking account, but was at all times kept by her separate, from her other funds in order that the same should be delivered to the legatees of the proceeds of said property”.
 

 Opponents further aver “that the fact that the decedent before her death effected a sale of a part of the property the proceeds of which she had bequeathed to them as aforesaid, did not have the effect of nullifying said bequest, but was made by her in strict harmony with her entire testamentary purpose, and therefore said net proceeds of the sale of the property 1120 Saint Philip Street as well as the proceeds of the remaining unsold property 1122 St. Philip Street more fully described in said account belong to your opponents and to the other legatees therein named and should be accounted and delivered to them by the executor of decedent’s estate in accordance with the last wishes of the said decedent”.
 

 Opponents prayed for judgment decreeing them to be entitled to the sum of $2605, “being the net proceeds of the sale of the property 1120 Saint Philip Street, as well as being entitled to the net proceeds of the sale of the property 1122 Saint Philip Street”.
 

 There was judgment dismissing the opposition and ordering the provisional account of the testamentary executor approved and homologated and the funds distributed in accordance therewith. From this judgment the opponents appealed.
 

 
 *389
 
 -The sole question presented is whether there was a tacit revocation of that particular testamentary disposition in the will which provided that the two houses, Nos. 1120 and 1122 St. Philip Street, were “to be put up for sale, and out of this sale I give and bequeath Evelyn Penn Puig $1000.00 Jack Yuille, $1000.00 St. Augustin Church $1000.00 Mandeville Arnoult $300.-00 in memory of his numerous kindnesses to me and mine.- — The rest of the money from the two houses I give and bequeath to the Maison Hospitaliere (I mean the rest of the amount brought from small houses)”. As we have said, Miss Locarno sold the house with Municipal No. 1120 St. Philip Street for the sum of $3300 cash, and in her bank book there were found two envelopes, each containing currency, one containing $3000 and the other $2605. The contention of opponents is that the $2605 in currency found in one of the envelopes is the balance of the proceeds of the sale of this property, the total proceeds being $3500. They say that they have identified this currency as being the balance of the proceeds, and that, since it was kept in an envelope separate and apart from the other assets of her. succession, this currency should be delivered to them because, according to their argument, it is evident that the testatrix intended that the proceeds of the sale be used to pay the special legacies.
 

 But opponents concede that Miss Locarno spent a portion of the proceeds of the sale. The proceeds of the sale amounted to $3300, and there was only $2605 in this envelope, so that it is conceded by opponents that she spent $695 of the proceeds of the sale.
 

 The universal legatees under the will intervened, alleging that they were interested in the opposition filed to the account, and joined the executor, their contention, in which counsel for the executor concurs, being that there was a tacit revocation of this particular disposition in so far as the property sold w;as concerned. This contention was upheld by the trial judge.
 

 Article 1691 of the Revised Civil Code, as amended by Act No. 114 of 1928, provides that the revocation of testaments by the act of the testator is either express or tacit, general or particular, and that
 

 “It is tacit when it results from some other disposition of the testator,
 
 or from some act zvhich supposes a change of zmll.
 

 ■
 
 “It is general when all the dispositions of a testator are revoked.
 

 “It is particular when it falls on some of the dispositions only, without touching the rest.” (Italics are the writer’s.)
 

 In Succession of.Müh, 35 La.Ann. 394, 48 Am.Rep. 242, Justice Manning, speaking for the court, said, referring to Article 1691 of the Code:
 

 “The Code declares that a revocation of a testament by the act of the testator may be express or tacit, general or particular. It is express when the testator has formally declared in writing that he revokes his will, or a particular disposition of it. It is tacit when it results from some other disposition of the testator, or from some act which supposes a change of will.' * * *
 

 
 *391
 
 “The meaning is plain. If a testator has made another disposition, repugnant to and inconsistent with the previous, one, although nothing is said about revoking the former, a tacit revocation will thereby be made.
 
 S'o also if he has done any act which supposes a clwnge of will, let tliat act be what it may, provided always the intention to revoke is fairly and legally deducible from it, a tacit revocation will result from the act.”
 
 (Italics are the writer’s.)
 

 In the case at bar, the testatrix did two things, each of which “supposes a change of will” with reference to the particular legacies involved. Her first act was to sell a part of the property which she ordered to be sold by her executor, and her second act was to spend a portion of the proceeds of the sale of the property. By selling the property she made it impossible for the executor to sell it and carry into effect this particular disposition found in the will in so far as it relates to the property bearing Municipal No. 1120 St. Philip Street. The fact that, after selling the property, she spent for her own use $695 of the proceeds of the sale conclusively shows a change of will as to the disposition of the proceeds of the sale.
 

 The testimony shows that for several months prior to her death Miss Locarno was a very sick woman. For some two or three months at least, she was confined to her bed. For some time prior to the period during which she could not leave her bed, she was in bed the greater portion of the time but was able to get up and go to the bank. Records kept by the bank show that she opened her bank box several times after she sold the property. Her expenses during her last illness were very heavy. A physician attended her regularly, her drug bills amounted to $50 or $60 a month, and she kept special nurses night and day. Mr. Villere, testamentary executor, testified-that he was familiar with her business, that he knew the amount of her revenue, which he said was not sufficient to pay her expenses. Mrs. Corinne Eshleman testified that she had been intimately acquainted with Miss Locarno from childhood, and that she frequently visited her during her last illness; she testified that Miss Locarno told her that the reason she sold the property was that her expenses exceeded her revenue and that it was necessary for her to have additional funds. There is no testimony to show what bills Miss Locarno paid with that portion of the proceeds of the property which she spent, except that Mr. Villere, testamentary executor, testified that she told him that she bought a diamond ring with a portion of it.
 

 Article 1695 of the Revised Civil Code reads as follows: “A donation inter vivos, or a sale made by the testator of the whole or a part of the thing bequeathed as a legacy, amounts to a revocation of the testamentary disposition, for all that has been sold or given, even though the sale or donation be null, and the thing have returned into the possession of the testator, whether by the effects of the nullity, or by any other means.”
 

 Counsel for opponents say that this article has no application here for the reason that there was no sale “of the thing bequeathed as a legacy” and therefore no revocation of the testamentary disposition.
 
 *393
 
 It is true, as counsel say, that there was no sale “of the thing bequeathed”. As a matter of fact, Miss Locarno did not bequeath the property itself to these special legatees. She ordered that it be sold by her executor, and “out of this sale” she bequeathed to them certain amounts. Counsel concede that, if Miss Locarno had bequeathed to these legatees the property at 1120 St. Philip Street, the sale of it would have amounted to a revocation of the testamentary disposition, according to Article 1695 of the Code. But they argue that she bequeathed only the proceeds of the sale.
 

 Conceding, as counsel argue, that the sale of the property did not, of itself, amount to a revocation of the testamentary disposition under the terms of Article 1695 of the Code, yet the act of selling the property was an act “which supposes a change of will”, and this act, coupled with her use of the proceeds of the sale of the property, shows conclusively, we think, that as to this special bequest she changed her mind completely after she made the will. We think that her intention to revoke this particular testamentary disposition, in so far as it relates to that portion of the property sold, “is fairly and legally deducible” from the acts themselves.
 

 Counsel for opponents argue that the currency contained in the envelope was identified. We do not think it was. Neither of the envelopes containing currency had on it any writing, figures, or markings whatsoever. The $2605 in currency found in one of the envelopes was composed of bills of various denominations. There were four $100 bills, several hundred dollars in $20 bills, some $10 bills, and some $5 bills. The testimony shows that, when Miss Locarno sold the property,' she received therefor $3300 in currency of practically, the same denominations as those bills found in the envelope in the bank box. But that does not prove that the currency found in the envelope was the same currency which she received from the sale of the property. Furthermore, there is nothing whatever to indicate, much less to show, that it was the intention of Miss Locarno that this money be kept separate to pay the legacies. If she had so intended, it is reasonable to assume that she would have earmarked the envelope or its contents in some way to indicate or show such intent.
 

 For the reasons assigned, the judgment appealed from is affirmed.
 

 PONDER, J., takes no part.